OPINION OF THE COURT
Nicholas Colabella, J.
Motion by defendants Santucci and 37 Croton Dam Road Corp. (Croton) for summary judgment dismissing the complaint; cross motion by plaintiffs for summary judgment in favor of the complaint against Santucci and Croton; motion by defendants Jorling and the Department of Environmental Conservation (DEC) for partial summary judgment dismissing the complaint as against it and in favor of its cross claim as to liability of Santucci and Croton and for realignment of Jorling and the DEC as plaintiffs; motion by the DEC for preliminary injunctive relief enjoining Santucci and Croton from blasting and processing for the remaining of 1994. Motions are consolidated for determination, defendants Santucci and Croton are collectively referred to below as "defendants”; codefendants Jorling and DEC are collectively referred to as "the DEC”.
(1) Motion by defendants Santucci and Croton insofar as it seeks summary judgment dismissing the first cause of action to revoke defendants’ mining permit is denied; cross motion by plaintiffs insofar as it seeks summary judgment in favor of the first cause of action as against defendants Santucci and Croton and motion by defendant DEC insofar as it seeks partial summary judgment in favor of its cross claim against defendants Santucci and Croton as to liability are granted, pursuant to ECL 71-1307, to the extent the court declares that defendants Santucci and Croton have violated the terms of the *487 October 1991 mined land reclamation permit and 1991 consent order; the 1991 mined land reclamation permit issued by DEC to defendants Santucci and Croton is revoked; defendants Santucci and Croton and/or their successors are enjoined from conducting activities at the site until or unless DEC issues a mined land reclamation permit to defendants.
Plaintiffs and the DEC maintain that defendants’ mining and processing of aggregate rock at a rate in excess of 100,000 tons per year violates the mining permit issued defendants in 1991 restricting defendants to mining emery at a maximum rate of 2,200 tons per year. Defendants contend that the production of aggregate is incidental to the mining of emery and that the amount of aggregate produced is consistent with the mining of emery permitted by the permit and consistent with the operation of the prior permittee Leardi. In support, they offer affidavits and deposition testimony of Leardi that he extracted between 3,000 and 5,000 tons of emery per year and, in the course of, blasted between 150,000 and 500,000 tons of rock (both aggregate and emery) per year and, at different times, processed and sold both aggregate and emery.
Assuming, arguendo, that the court credits the foregoing statements by Leardi as to the scope of his operation, he misrepresented it in listing on all his applications that the only mineral he mined was emery, in the 1985 narrative that the maximum mined in any one year was 2,200 tons and in the 1988 narrative that the amount mined was "minimal”. Leardi should have included on his permit applications that he was seeking to mine both emery and aggregate and the quantities of both to be mined, if he intended to process and sell both, in order for the DEC to properly assess the environmental impacts of the proposed operation since a permit was required to mine more than 1,000 tons of minerals annually, permit applicants were required to identify the minerals to be extracted on the applications, the definition of the term "minerals” in effect at that time included both emery and aggregate (ECL 23-2705 [7]) and the extraction and processing of aggregate fell within the definition of "mining”.
Defendants apparently realized as much in applying for a "renewal” permit to mine up to 100,000 tons of emery and aggregate. Addressing the nature of mining, the application stated: "the property has been extensively mined for emery and aggregate more than 100 years [section 1.1] * * * Operations at the mine will continue to be a surface consolidated mine involving the extraction of rock for the production of *488 aggregate [section 1.3] * * * Principal products from the Leardi mine included emery that was used for abrasives, and high-friction aggregate for use in paving materials * * * the present operator intends to continue to sell the material for abrasives and aggregate [section 2.4].” Addressing the quantity of rock to be extracted, the application made no distinction between emery and aggregate, but contested the volume reported by Leardi: "Information submitted with the 1985 permit renewal application states that a maximum of 2,200 tons were mined in a year; however, available data indicate that the production rates were much higher, at least since 1985 * * * This amounts to about 100,000 tons [illegible] which is the proposed rate of mining [section 1.3].” The DEC, however, rejected the characterization of such an application as a renewal.
The September 11, 1991, letter of DEC representative David Reid stated "the permit would * * * be renewable for this area at the total extraction rate of 2,200 tons per year as per the standing mining narrative in the prior application prepared by Mr. Leardi dated July 8, 1985. The proposed change in the scope of the authorized activity to mine and process up to 100,000 tons per year * * * will be treated as a new application * * * as it involves a material change in the scope [rate] of the permitted actions” (emphasis in original).[1] Defendants, therefore, could have been under no illusion that the "renewal/transfer” permit subsequently issued, allowing mining of "emery” at the "maximum rate of 2,200 tons” in accordance with "previously approved mining and reclamation plans and narratives of [1985] and [1988]”, permitted defendants to extract and process aggregate in addition to emery at a rate of 100,000 tons.[2]
Defendants’ continued operation of the mine nonetheless to mine aggregate rock in excess of 100,000 tons annually instead of pursuing what the DEC said had to be a new application can only be understood as an effort to avoid the *489 strictures of the process for a new application and/or to avoid contesting the DEC’s determination that the application represented a material change from the prior permitted activity. In either event, defendants have violated the terms of the mining permit and the 1991 consent order which required that defendants cease mining except as allowed by a mining permit.
Defendants provide no authority for their claim that they have the right to process aggregate, absent a specific permit to do so, and to do so in unlimited quantities. The October 7, 1991 letter of Joyce Jiudice, a DEC attorney, on which defendants rely, made no distinction between aggregate and emery in stating that "processing activity shall be limited to processing of material obtained on site of this facility in an amount concomitant with the mining of 2,200 tons of material per year” (emphasis added). The letter, in fact, had nothing to do with whether processing of specific minerals was permitted under the mining permit. Jiudice’s letter was only addressing the narrow issue of whether the crushing equipment could operate without air emission permits while the application for such permits were pending review. The air emission permits, which are distinct from the mining permit, were designed only to ensure that the machines performing the processing met air quality standards. The following sentence in Jiudice’s letter, "Processing at this rate is consistent with the activity to be authorized by the issuance of the Mined Land Reclamation permit pursuant to your client’s application for transfer” (emphasis added), however, implies that a definite limit was intended in the amount of material that could be processed and the only sensible interpretation is that the material that could be processed was the mineral expressly permitted to be mined under the mining permit — emery.[3] Since emery could only be extracted in the amount of 2,200 tons per year, it follows that processing was also limited to 2,200 tons.
Defendants’ contention, that there was no specific limit to the amount of aggregate that could be mined, is also inconsistent with the Mined Land Reclamation Law (MLRL) and State Environmental Quality Review Act (SEQRA). If accepted, defendants’ view would mean that, while the quantity of emery that could be extracted and processed was regulated, there would effectively be no regulation of the *490 aggregate that could be extracted and processed. The amount of aggregate that could be mined under such an interpretation would expand indefinitely as emery deposits grow scarcer and harder to find. The subversion of the MLRL and SEQRA that defendants’ interpretation engenders is already evident in the fact that defendants have extracted only 100 tons of emery while mining over 550,000 tons of rock in the guise of mining emery since 1988. At these rates of production, it is clear that there is little economic incentive to mine emery and that the mining of emery has become only incidental to the mining of aggregate.
Defendants also imply that a right to process aggregate arises from the nature of mining emery, through open face blasting, because in blasting to obtain emery, aggregate is incidentally and unavoidably extracted. This argument overlooks the description of the aggregate by defendants’ geologist Roy Budnik in his May 13, 1992 affidavit as "waste”. Defendant Santucci similarly describes the unprocessed aggregate in his moving affidavit as "spoils”. According to ECL 23-2705 (16), "spoil” means "any waste material removed from its natural place in the process of mining and all waste material directly connected with the cleaning and preparation of any minerals.” The disposition of waste is included in the definition of "mining” as a regulated activity. Defendants’ mining permit recognizes the existence of waste rock and provides for its use in reclamation.[4]
There is no provision in the permit or in the statutory definition of "mining”, by contrast, for the processing of "waste” or "spoil.” Processing is only mentioned in the definition of mining in connection with the extraction or removal of minerals from their original location or making minerals suitable for commercial, industrial or construction use. Thus, if the aggregate is classified as waste or spoil, as defendants do, it is something that lacks commercial, industrial or construction use or that has already been processed. Conversely, if the aggregate is to be processed and sold, as a mineral with commercial value, it is not waste or spoil. In that case, as discussed above with respect to Leardi, it should be the subject of a specific permit notwithstanding that it is extracted in conjunction with, or as a by-product of, mining emery.
*491 Defendants’ further contention, that the DEC’s interpretation of the permit prevents the viable operation of the mine, is irrelevant. By applying for, and receiving, a "renewal” permit, defendants bound themselves to maintain the operation of the mine in accordance with the prior permits. The permits that were issued were for what Leardi represented was a relatively low-level operation and the return to Leardi was presumably commensurate with such an operation. Subsequent statements by Leardi, discussed above, which suggest he misrepresented the nature of the mining operation in applying for permits, while relevant to whether the current operation is an enlargement of a nonconforming use, do not establish a basis for allowing defendants the benefits of an expanded operation in contravention to the existing permit.
Finally, there is no merit to defendants’ contentions that the DEC affirmatively approved defendants’ mining operation or that the DEC is estopped from now seeking enforcement of the MLRL by failing to take action earlier to redress violations (Matter of Hamptons Hosp. & Med. Ctr. v Moore, 52 NY2d 88; accord, Matter of Parkview Assocs. v City of New York, 71 NY2d 274).
(2) Cross motion by plaintiffs insofar as it seeks summary judgment as to imposition of penalties for violation of the mined land reclamation permit and consent order is denied with leave to renew on proper papers, if appropriate, following the preliminary conference, scheduled below.
Although requested in the complaint, plaintiffs only cursorily address such relief in their moving papers. The assessment of penalties shall be discussed at the preliminary conference.
(3) Motion by defendants Santucci and Croton insofar as it seeks summary judgment dismissing the second cause of action, declaring "any mining operations at the Site in excess of 2,200 tons” to be an unlawful expansion of a legal nonconforming use and cross motion by plaintiffs insofar as it seeks summary judgment in favor of the second cause of action are denied.
While it has been held that a "mere” increase in volume does not constitute an extension or enlargement of a lawful nonconforming use (People v Perkins, 282 NY 329, 330; Ruhm v C. P. Craska, Inc., 59 AD2d 1016),[5] an increase in the *492 volume of production in conjunction with other factors may indicate a material change in the use.[6] Anderson, New York Zoning Law and Practice § 6.33, at 261 (3d ed) states: "A growing number of decisions support the conclusion that where the ordinance prohibits the extension of a nonconforming use and where the conduct complained of includes not only an increase in volume or intensity of use but some qualitative alteration of the use, the courts will detect an unwarranted extension of use.”
In this case, plaintiffs allege a change in the focus of the mine from an emery mine to an aggregate mine, an increase in the volume of mining, and resultant environmental consequences. Although not involving the specific issue of expansion of a prior nonconforming use, the alleged change in use at bar is similar to the facts in Matter of Briarcliff Assocs. v Town of Cortlandt (Sup Ct, Westchester County, July 29, 1987, Marasco, J., index No. 21543/86) in which the court held the mining operator’s intent to mine aggregate was a "significant change in the level of operations with the additional change in focus from mining emery to producing crushed stone” (at 5-6). The Appellate Division thereafter sustained the Town’s requirement of an environmental impact statement, noting: "[t]he minutes of the public hearing disclose that the petitioner’s activities would far exceed those of its predecessors in intensity. Additionally, instead of emery, the primary product to be mined would be crushed stone. Approximately 50,000 cubic yards would be quarried annually, necessitating between 48 and 60 truck trips daily. Local residents expressed their opposition, citing fears of dangers to their children, damage to their property and generally a decline in the quality of life they had enjoyed during the quarry’s relative inactivity” (144 AD2d 457, 457-458).
*493 Whether the current use in this case is, in part or in its totality, an extension or enlargement of the prior nonconforming use involves issues of fact. Leardi’s statements in his affidavits to the DEC in support of defendants’ permit application and in his deposition testimony dispute the position of plaintiffs that he mined a maximum of 2,200 tons of emery and that emery was the only mineral he extracted, processed and sold. The inconsistency between these statements and his statements to the DEC on his prior permit applications, and his lack of corroborative records merely raise issues of credibility for the trier of fact.[7]
The court rejects plaintiffs’ contention that defendants are collaterally estopped from contesting this issue as the result of the DEC deciding that the application to mine at the present levels was a material change from previously permitted activity (see, Allied Chem. v Niagara Mohawk Power Corp., 72 NY2d 271, cert denied 488 US 1005; Johnson v Penn Mut. Life Ins. Co., 184 AD2d 230). The DEC’S decision was based on a comparison with the prior applications and the permits that had been issued, it was made for the limited purpose of determining whether to classify defendants’ application as a "renewal”, and it did not address whether the use proposed by defendants was actually an unlawful enlargement of the prior nonconforming use.
The court also rejects plaintiffs’ contention that, even if defendants’ operation of the mine was similar to that of Leardi, Leardi’s failure to obtain a proper mining permit made the operation an unlawful nonconforming use. A nonconforming use must be lawfully established prior to the change in zoning in order for the user to have a right to continue it. In this case, the mine was established as a lawful nonconforming use in 1951, when the district in which the property was located was rezoned for residential use, prior to the enactment of the MLRL. The only relevant issue at bar is whether Leardi’s use was consistent with that prior nonconforming use. Assuming Leardi’s operation of the mine was consistent, the failure to later obtain a proper permit did not vitiate his right to continue it as an otherwise lawful nonconforming prior use. If Leardi’s operation of the mine was an *494 enlargement of the prior nonconforming use, the enlargement was unlawful regardless of whether the permit he obtained was proper (see generally, Anderson, New York Zoning Law and Practice §§ 6.12-6.13 [3d ed]).[8]
The court rejects plaintiffs’ further argument that the prior nonconforming use was abandoned by Leardi in the 1980s as the result of his failure to actively mine the site. While Leardi testified he reduced his involvement in mining personally, he did not testify he ceased all involvement. In addition, the site continued to be mined by others under a lease arrangement during that time.
(4) Motion by defendants Santucci and Croton insofar as it seeks summary judgment dismissing the third cause of action for a public nuisance and cross motion by plaintiffs insofar as it seeks summary judgment in favor of the third cause of action are denied.
Although the defense to the nuisance claim, that the operation of the mine is in compliance with all applicable regulations, is vitiated by the court’s determination that defendants violated their mining permit, there remain triable issues of fact as to whether there are any serious environmental impacts from the mine’s operation. Plaintiffs’ allegations as to such impacts are disputed by affidavits of other residents. In addition, since defendants failed to submit an appropriate application for the current operation of the mine, as required by the DEC, there has never been a full SEQRA review of its effects.[9]
(5) Motion by defendants Santucci and Croton insofar as it seeks summary judgment dismissing the fourth cause of action for failure to secure a building permit is denied; cross motion by plaintiffs for summary judgment in favor of the fourth cause of action is granted to the extent that it is declared that the construction of the concrete retaining wall required a *495 building permit.[10] Defendants shall file for a permit within 30 days of service of this order and demonstrate to the Town that the wall complies with the building code. In permitting such proof, the court makes no determination at this time as to the feasibility of showing compliance given that the structure has already been completed.
ECL 23-2703 (2) states, in relevant part, that
"this title shall supersede all other state and local laws relating to the extractive mining industry; provided, however, that nothing in this title shall be construed to prevent any local government from:
"(a) enacting or enforcing local laws or ordinances of general applicability, except that such local laws or ordinances shall not regulate mining and reclamation activities regulated by state statute, regulation, or permit.”
In this case, enforcement of the Town Code with respect to obtaining a building permit, an ordinance of general applicability, was not preempted by the Mining Land Reclamation Law since the Town ordinance does not involve regulation of mining, but the requirements for a structure (see, ECL 23-2703 [2] [a]; see, e.g., Matter of Schadow v Wilson, 191 AD2d 53). Such control is merely incidental to a municipality’s right to regulate land use generally (Matter of Frew Run Gravel v Town of Carroll, 71 NY2d 126; see also, Matter of Hunt Bros. v Glennon, 81 NY2d 906). Compliance with the requirement for a building permit does nothing more than ensure the integrity of the structure and, assuming defendants are correct that it has been built to code, involves a matter over which the Town has little or no discretion.* [11] Further, the failure of the Town to prosecute the notice of violation served on defendants for failing to obtain a building permit prior to this action does not estop it from seeking to doing so in this action (see, Incorporated Vil. of Asharoken v Pitassy, 119 AD2d 404).
*496 (6) Cross motion by plaintiffs insofar as it seeks the imposition of penalties for failure to secure a building permit is denied with leave to renew on proper papers, if appropriate, following the preliminary conference at which the subject of penalties shall be addressed.
(7) Motion by defendants Santucci and Croton insofar as it seeks summary judgment dismissing the fifth cause of action for attorney’s fees and expert fees is granted; cross motion by plaintiffs for summary judgment in favor of the fifth cause of action is denied.
Absent a specific provision for attorney’s fees and expert fees in ECL 71-1311, there is no basis for the court to award attorney’s fees and expert fees (see, Matter of Gordon v Marrone, 155 Mis 2d 726, 731-732). The Federal statutes that plaintiffs cite as similar to the New York statute are distinguishable in that they expressly allow for an award of fees.
(8) Motion by the DEC insofar as it seeks summary judgment dismissing the complaint as against it is granted for failure to state a cause of action against DEC.
(9) Motion by the DEC insofar as it seeks realignment as a plaintiff is denied as moot. DEC has asserted its common interest in relief against codefendants by cross claim which has, as discussed above, been granted. Realignment is unnecessary. DEC has also failed to demonstrate any New York precedent or statutory predicate for such relief after joinder of issue or prejudice to it by continuing in the action as a nominal defendant.
(10) Motion by the DEC to preliminarily enjoin mining operations by Santucci and Croton is denied as academic in light of the granting of summary judgment on the cross claim revoking the mining permit.

. Reid’s letter noted several potential environmental concerns, similar to those raised in this action, if mining were allowed at the rate of 100,000 tons, e.g., effects on drainage and hydrology, the "enormous” increase in truck traffic, possible effects from blasting on nearby homes, and the need for changes in the reclamation plans.

. Defendant Santucci’s suggestion in his moving affidavit that the DEC impliedly reversed its decision to treat the application as "new” by subsequently issuing a "renewal” permit, is impossible to reconcile with Reid’s September 11, 1991 letter.

. Permission to process emery was implicit in the mining permit’s permission to mine emery since the definition of mining in the Mined Land Reclamation Law includes processing.

. Although the reclamation plan in special condition (3) of the permit refers to reclamation upon the closing of mining in an area, it is clear that waste rock must be stockpiled in those areas prior to closing in order to effectuate the reclamation plan.

. Increased output as the result of more efficient equipment, for exam- *492 pie, is to be expected in any industrial operation as it modernizes (see, McGovern v Anzolone, 22 Misc 2d 895 [holding substitution of ready-mix trucks and other mechanical devices in place of dump trucks and hand-loading equipment did not alter existing nonconforming use]; see also, Matter of Hoffay v Tiff, 164 AD2d 94, and Maloy v Town Bd., 92 AD2d 1056 [holding addition of rock crushers constitutes accessory use to, rather than enlargement of, existing quarry operation]). Similarly, an increase in sales may reflect the increase in available stone and market demand for it without a fundamental expansion of the prior use (cf, People v Perkins, supra; Ruhm v C. P. Craska, Inc., supra).

. Matter of Syracuse Aggregate Corp. v Weise (51 NY2d 278) observes quarrying is a unique use of the land as it consumes the corpus of the land as a resource.

. Plaintiffs argue that there is no triable issue of fact that processing and truck traffic has increased. Even assuming this to be true, that does not resolve the issue of whether the mining activities constituting the prior nonconforming use were limited to 2,200 tons per year as plaintiffs would have the court declare.

. Briarcliff Assocs. v Town of Cortlandt (Sup Ct, Westchester County, Oct. 4, 1993, Ingrassia, J., index No. 7243/89), in which the court held the mining without a permit did not create a prior existing use, is distinguishable in that there a necessary permit was not obtained prior to the zoning change. In this case, a permit was not required at the time the property was rezoned.

. Since the court has found a violation of the mining permit, the court need not reach the question of whether an action for public nuisance could be maintained in the face of compliance with all applicable State and local regulations.

. Defendants do not dispute that the retaining wall is a "structure” as defined by local ordinance and that, unless preempted, a building permit from the Town was necessary.

. Defendants have also not demonstrated that the safety of the structure is encompassed within the regulation of mining by State statute, regulation or permit. The DEC has not taken a position and, in its answer, disavows any regulatory authority with respect to the Town Code. Similarly, the mining permit granted defendants does not address the structure specifically and states that "[ujnless expressly provided for, the issuance of this permit does not apply to any structures contained on the plans or in the specifications, nor does this permit apply to safety aspects of the operation and/or reclamation plan” (para 15).