INCORPORATED VILLAGE OF ASHAROKEN, Respondent, v CAESAR L. PITASSY et al., as Trustees under a Trust Agreement Dated June 19, 1978, et al., Appellants.

Second Department, October 14, 1986

### APPEARANCES OF COUNSEL

*Cahn, Wishod, Wishod & Lamb (Richard C. Cahn* of counsel), for Caesar L. Pitassy and another, appellants, and *Corwin & Matthews (Charles T. Matthews* and *Eleanor J. Ostrow* of counsel), for Sandpiper Farm Riding School, Inc., appellant; *Paul, Weiss, Rifkind, Wharton & Garrison (Edward N. Costikyan),* of counsel to both firms. (One brief filed.)

*Jonathan Heidelberger, Village Attorney,* for respondent.

### OPINION OF THE COURT

WEINSTEIN, J.

The central issue to be resolved herein is whether the defendant Sandpiper Farm Riding School, Inc. (hereinafter Sandpiper), constitutes a "private school" within the meaning of the Village of Asharoken Zoning Ordinance § 301 (5), thereby qualifying it for categorization as a permitted use pursuant to said ordinance. Although the issue of whether a riding academy can be considered a school for zoning purposes has been touched upon by several courts at the trial level, there is a dearth of appellate authority on the issue in this jurisdiction.

The underlying dispute emanated from the attempt by two lifelong residents of the Incorporated Village of Asharoken, who became partners and codirectors of the defendant Sandpiper, to open a school of horsemanship on a portion of the Morgan Estate. The corporate defendant was formed pursuant to that end. The property known as the Morgan Estate is a 440-acre unsubdivided tract situated in the plaintiff village, which is itself a residential community comprised of approxi-

mately 278 houses with a total population of some 650 to 700 people. Other than the subject of this appeal, there are no commercial or business uses in the village.

The Morgan Estate was purchased by the defendants Pitassy and Kartiganer as trustees under a trust agreement dated June 19, 1978 immediately following a prolonged attempt by one Papparazzo to obtain changes in the village zoning ordinance to allow for large residential development. The defendant trustees openly denounced any intention of developing the property and instead proclaimed their interest in preserving the land in its natural state. The estate is located in a two-acre residential zone or Zone C and is virtually undeveloped.

The minutes of the August 1, 1981 regular meeting of the village Board of Trustees contains the following excerpt:

"The Mayor announced that he had been told, just this day, by Mr. Pitassi *[sic]*, a Trustee of the owners of the former Morgan property, that two individuals from the Village had approached him with the notion of leasing a portion of the property to operate a private school of horsemanship. The Mayor went on to report that Laurie Landeau and Daniel Twitchell had made such a proposal to the Trustees of the land and that the Trustees had approved of the concept. The Mayor noted that the Village Ordinance allows private schools as a permitted use and had no other information to report. Mr. Twitchell explained that no building construction was required but the barns and caretakers home would be restored and that the land Trustees had given permission for some land to be leveled for use as a riding rink.

"Discussion followed raising questions on whether the school would be tax exempt, chartered by the State Education Department, and if construction of a rink required a building permit."

On August 27, 1981, the defendants Pitassy and Kartiganer entered into a 10-year lease with the defendant Sandpiper granting the latter the right to use a portion of the Morgan Estate for the establishment of their school of horsemanship. The lease specified that it was subject to all "[z]oning rules, restrictions, regulations, resolutions, ordinances, building restrictions and governmental regulations" currently in effect or to be thereafter adopted by any duly authorized body. In preparation for the opening of their facility, the directors of Sandpiper undertook certain improvements of the leased acre-

age, including repairing old barns and constructing stall, paddocks, a cross-country course and two outdoor riding rings. At the request of Sandpiper's attorney, the then Superintendent of Buildings for the village reviewed the proposed repairs and improvements to insure that Sandpiper was not violating any of the ordinances.

At the next regular meeting of the Board of Trustees on September 14, 1981, Village Trustee Kelly (who was subsequently elected Mayor) raised questions concerning the legality of operating a school of horsemanship on the subject property. The Village Attorney acknowledged that sufficient facts were lacking from which a determination could be made as to whether the school constituted a permitted use. Mayor Anderson thereupon proposed to contact the representatives of the property owners in order to schedule a meeting with the Board of Trustees. Village Trustee Kelly and several village residents thereafter hired private counsel to ascertain whether the Sandpiper operation constituted a legal use of the property.

Far from offering assurances to the defendants with regard to the acceptability of their proposed use, the minutes of successive board meetings indicate that at least some of the board members as well as local residents had serious reservations concerning the legality of the Sandpiper operation. At the October 5, 1981 regular meeting, for instance, a representative of the Eaton's Harbor Corporation questioned the status of the subject operation and expressed concern that the "school" was advertising in the pennysaver more in the manner of a conventional business rather than an educational institution.

Shortly thereafter, a special meeting of the Board of Trustees was convened for the purpose of allowing representatives of the owners of the subject property to make a presentation to the board on the use of the property as a private school of horsemanship. The representatives declined to attend, however, when informed of the possibility that the press would be present. A suggestion was unanimously adopted at the special meeting for the Superintendent of Buildings to request the property owners to submit a formal change in use by way of an application for a certificate of occupancy, thereby placing the burden on the property owners to describe in detail the proposed new use of the premises. It was reasoned that the facts and circumstances of the Sandpiper use could best be determined thereby.

Sandpiper, however, refused to comply, taking the position that no provision of the village ordinance required a landowner or occupant of real property to apply for a permit where a change of use occurs. In response to the Superintendent of Buildings' request, Sandpiper proffered a brief general description of the school and its plans and enclosed a copy of its curriculum and a curriculum vitae of its principal instructors.

Sandpiper continued to arise as a topic of discussion at ensuing board meetings with no resolution being reached. At the February 1, 1982 regular meeting, the Village Attorney explained that there had as yet been no definite judicial pronouncement in this State as to whether schools of this type fall within the range of uses permitted in an ordinance covering schools, libraries and museums, so that the board was faced with deciding whether this question should be submitted for judicial resolution. In apparent agreement with a trustee's observation that the zoning ordinance was ambiguous, the board considered draft proposals on schools, certificates of occupancy and control of horses. Provision was made for the publication of notice of a public hearing to be conducted with respect to a proposed local law on changes of use and certificates of occupancy. The record is barren of any further action taken with respect thereto.

In early June 1982, Superintendent of Buildings Giannoni announced his resignation, effective July 1, 1982. On June 23, 1982, the defendant Pitassy submitted to Giannoni an application for a building permit to erect an "auxiliary utility building for uses required by tenants". Giannoni granted the permit some two days after submission of the application without ever having advised the Board of Trustees of his action. Not until after his resignation did Giannoni inform newly elected Mayor Kelly that he had issued the June 25 permit for a new building, specifically, a barn to house an indoor ring. At that time, Giannoni learned from Mayor Kelly of the existence of a separate three-sided structure on the subject property. The former Superintendent of Buildings thereupon visited Sandpiper's premises and observed a three-sided horse shelter located thereon. At Giannoni's suggestion, Sandpiper submitted an application for a building permit with respect to the three-sided structure. The permit was issued by Giannoni on July 9, 1982, some eight days subsequent to the effective date of his resignation.

At its July 1982 meeting, the village Board of Trustees

voted to revoke the June 25 permit for the indoor riding ring on the grounds that it constituted an improper use under the zoning ordinance and that Giannoni had acted ultra vires. The new Superintendent of Buildings informed the defendants' representative of the revocation both verbally and in writing, and advised him not to commence work on the project. There is no indication on record of any attempt by the Board of Trustees to revoke the July 9 building permit for the three-sided structure.

At the invitation of the village, the defendants' attorneys appeared at the October regular meeting of the Board of Trustees, ostensibly to provide the board with explicit information about the operations of Sandpiper in order to avoid submitting the matter for judicial resolution. The defendants' attorneys assumed the position that the owners had a vested right to continue the school of horsemanship on the subject premises. They flatly rejected a suggestion that Sandpiper cease to operate while the issue of the legality of the use was being determined.

Upon reviewing the plans submitted to the former Superintendent of Buildings in conjunction with Sandpiper's application for a building permit with respect to the structure housing the indoor ring, the new Superintendent determined that there were serious problems with the submittal. Notwithstanding his endeavors to obtain additional and more comprehensive plans and specifications, the defendants' agents failed to cooperate. At some point during construction, a notice of violation was issued with which the defendants also failed to comply.

In view of the defendants' continued noncompliance, the village commenced an action seeking a judgment permanently enjoining the defendants from (1) operating on the subject premises a school of horsemanship or any other use not expressly permitted by the village zoning ordinance and (2) using and occupying the "auxiliary building for uses required by tenants", i.e., the indoor riding ring for which the building permit had been revoked in July 1982. The village moreover sought a judgment directing that said edifice be removed from the premises.

While the action was pending, the defendants commenced a CPLR article 78 proceeding against the village seeking to compel the Superintendent of Buildings to carry out a final inspection of the subject building and to either issue a certifi-

cate of occupancy therefor or, in the alternative, to designate the improper and or incomplete portions thereof and order that the structure be properly completed. Pursuant to the defendants' motion, the two matters were consolidated and tried before Justice Daniel F. Luciano.

Upon consideration of the voluminous evidence adduced at trial, the court concluded, on the basis of its factual findings with respect to what is taught at the defendant Sandpiper, that the establishment did not qualify as a private school within the meaning of the village zoning ordinance. Given its findings that the operation constituted an improper use and that a substantial portion of the construction work on the indoor riding ring was undertaken after the plaintiff's revocation of the improperly issued building permit, the trial court rejected the defendants' contention that the plaintiff was estopped from enforcing its ordinance against them. Judgment was thereupon entered granting the plaintiff a permanent injunction barring the operation of the program of instruction in horsemanship on the Morgan Estate, directing the defendants to remove the entire building housing the indoor riding ring and denying the defendants' motion for an order compelling the issuance of a certificate of occupancy by the village.

In passing upon the threshold issue of whether Sandpiper falls within the broad category of "private schools", recourse to the Zoning Ordinance for the Village of Asharoken, adopted on January 3, 1942, is necessary. In view of the concern expressed in Village of Asharoken Zoning Ordinance § 200 that "the introduction of business other than agriculture, in the Village might seriously affect the health and would seriously affect the comfort of the residents of the Village and the values of property therein", the village was divided into three classes of districts each of which is exclusively residential. In keeping with this concern, the following regulation was promulgated to apply to each of the three districts.

"Sec. 301. No building or premises shall be used, and no building shall be erected or altered which is arranged, intended or designed to be used except for one or more of the following specific uses:

"(1) Single family detached dwellings, the office, studio or occupational room of a professional person, such as a physician, surgeon, dentist, lawyer or artist, appurtenant to the same dwelling in which the practitioner resides, and provided there is no display of goods or advertising other than a sign

not larger than six inches by eighteen inches on the premises, and bearing only the name and occupation (words only) of the practitioner.

"(2) Clubs composed of residents of the Village except clubs the chief activity of which is a service customarily carried on as a business.

"(3) Churches and other places of worship.

"(4) Public schools or other public buildings necessary for the use and occupancy by the Village for administration purposes, water supply, sewage, pumping station, fire and police stations.

"(5) Private schools, libraries, museums or other buildings of an educational character, but not including summer camps or schools.

"(6) Agriculture, gardens, nurseries and green houses.

"(7) Accessory uses customarily incident to the above uses; the term 'accessory use,' however, to include use of an accessory building for residential purposes by members of the family or their guests, or by persons employed on the premises, or used for professional purposes by a professional person, such as a physician, surgeon, dentist, lawyer or artist, subject otherwise to the limitations prescribed by Paragraph (1) of this Section, but not to include a business or any buildings or use not located on the same plot with the building to which it is accessory, or the independent subletting or rental of an accessory building or its occupation by a person not a member, guest or employee of the resident family."

As cogently evinced by the aforementioned section, the general purpose and manifest policy intended to be promoted by the village zoning ordinance is the preservation and maintenance of the residential character of the community. The drafters of the ordinance unequivocally expressed their intent to exclude businesses and other activities not recognized as compatible with an exclusively and traditionally residential area. By specifically excluding summer schools or camps from the "private schools" exception, the drafters further made clear their intent to exclude purely nonacademic, recreational uses from that category.

While cognizant of the general principle that zoning ordinances, being in derogation of common-law property rights, are to be strictly construed against the governmental body which enacted them (*Thomson Indus. v Incorporated Vil. of Port Wash. N.*, 27 NY2d 537, 539), we note that said tenet does

not proscribe the application of a zoning ordinance in accordance with its expressed or apparent purpose. The following language of the Court of Appeals, set forth in the course of an attempt to ascertain the extent of a particular zoning ordinance, is illustrative here: "The restrictions on the use of property imposed by the Zoning Ordinance may not be extended by any administrative board or judicial tribunal in order to exclude a use which in its opinion should have been excluded in order to effectuate the purposes set forth in the preamble, nor may we give a strained meaning to the words of the ordinance in order to effectuate its purpose better. Nonetheless, we read this ordinance, as we read all statutes or ordinances, in the light of its expressed or apparent purpose in order to determine the meaning of its language and to avoid thwarting the intent of the legislative body *as expressed in that language*" *(Matter of Westchester County Socy. for Prevention of Cruelty to Animals v Mengel,* 292 NY 121, 126).

In the instant case, it cannot be gainsaid that the conclusion reached by the trial court is consistent with the expressed purpose of the village zoning ordinance. Nor does that purpose contravene any legitimate zoning objective, i.e., maintaining the health, safety and welfare of village residents. Consistent with the attainment of those objectives, the record reveals that the village gave consideration to such pertinent factors as (1) the fact that the road on which Sandpiper is located is a narrow two-lane road which is the sole ingress and egress from the village, (2) the possibility of blockage of the road by horse trailers, (3) potential interference with a nearby Coast Guard emergency rescue facility, (4) garbage pickup, and (5) congestion caused by exhibits and shows and the selling of food and other merchandise on the premises. Inasmuch as the restriction imposed by the village on the use of the subject property finds its justification in the police power exercised in the interests of the public welfare *(see, Matter of Westchester Reform Temple v Brown,* 22 NY2d 488, 493), it is valid.

While an educational use may not be wholly excluded from a residential district *(Matter of New York Inst. of Technology v Le Boutillier,* 33 NY2d 125, 130), case law in this State reveals that the concept of "educational use" does not include activities which are primarily recreational in nature *(see, Matter of Schoen v Bowne,* 298 NY 611, *affg* 273 App Div 1020; *Matter of 4M Club v Andrews,* 11 AD2d 720; 12 NY Jur 2d, Buildings, Zoning, and Land Controls, § 179, at 178). Moreover, it has been held that instructional programs involving classes in

ceramics and horsemanship are not educational in nature *(Matter of Schweizer v Board of Zoning Appeals,* 8 Misc 2d 878; *Village of E. Hampton v Mulford,* 188 Misc 1037; *see also, Matter of Donegan v Griffin,* 270 App Div 937 [where an order granting a variance for a limited time to permit the operation, on property in a residential zone, of a riding academy was reversed on the ground that the record failed to disclose adequate facts for the determination]). More recently, courts have recognized, albeit in dictum, that the activities of a riding academy are not educational in nature *(see, Matter of Imbergamo v Barclay,* 77 Misc 2d 188, 191-192; *Incorporated Vil. of Muttontown v Friscia,* 58 Misc 2d 912, 913). Such instruction does not constitute a school in the sense intended by the use of that term in zoning regulations, where the emphasis is on the academic rather than the recreational (1 Anderson, New York Zoning Law and Practice §§ 11.17, 11.19 [3d ed 1984]).

Although clearly not binding on this court, the decision of the Superior Court of New Jersey in *Wadsworth v Board of Adjustment* (11 NJ Super 502, 78 A2d 619, *lv denied* 7 NJ 80, 80 A2d 495) bears mentioning at this juncture. In upholding a building inspector's refusal to grant a use permit to the plaintiff owner, the court held that a privately owned and operated day school and school of equitation devoted to the boarding of horses and the instruction of children in horsemanship and other recreational pursuits was not a private school within the meaning of the township's zoning ordinance permitting public and private schools in residential zones. Notwithstanding the " 'derivative advantages culturally and socially of a knowledge of the art and science of equitation' ", the court reached its decision on the basis of the legislative definition of a private school as " 'a school attendance at which is a sufficient compliance with the compulsory education requirements contained in the State Statutes' " *(supra,* p 504, p 620). It was thus concluded that the words "private school" in the local zoning ordinance were used " 'in their traditional sense and not in any all-embracing sense, and are intended to describe that class of school which is purely academic in character' " *(Wadsworth v Board of Adjustment, supra,* p 505, p 620). Sandpiper is clearly deficient in that respect.

Absent either a statutory definition of general application or definitional language in the subject zoning ordinance itself *(cf. Matter of Brandt v Zoning Bd. of Appeals,* 90 Misc 2d 31, 33,

*affd* 61 AD2d 1012), resort to case law is imperative. As set forth in *Incorporated Vil. of Brookville v Paulgene Realty Corp.* (24 Misc 2d 790, 792, *affd* 14 AD2d 575, *affd* 11 NY2d 672), the three prime ingredients which are a *sine qua non* to qualification as a school are a curriculum, a plant consisting of adequate physical facilities and a qualified staff to carry into effect its educational objectives. The evidence adduced in the instant case and the reasonable inferences to be drawn therefrom lead ineluctably to the conclusion that the defendant Sandpiper is neither a school nor a permitted use under the plaintiff's zoning ordinance.

Notwithstanding the respective qualifications of its instructors, we find that Sandpiper lacks the structure, regularity of attendance and progression of instruction necessary to constitute a school. As per the testimony of the plaintiff's expert (who served as director of both the National Professional Horseman's Association and the Intercollegiate Horse Shows Association, as well as conducting classes for students from Stony Brook University and primary and secondary schools), a school of horsemanship, as distinguished from any other commercial riding establishment, has a structured program with classes coming at the same time each week so that students are afforded a progressive learning experience. The expert concluded, on the basis of her review of Sandpiper's records and her physical inspection of the premises, that Sandpiper lacked the requisite structure to legitimately constitute a school of horsemanship.

As acknowledged by one of Sandpiper's principals, there is no set schedule of classes. Rather, provided that there is a horse, instructor and ring available, a patron is free to come for lessons as frequently or as infrequently as he or she chooses. A review of the appointment book wherein Sandpiper's principals recorded customers' visits (which material was supplied in response to a subpoena calling for Sandpiper's class schedules from the school's inception to the time of trial) bears out the absence of any formalized schedule of instruction. Special exceptions have been made to allow patrons to ride unsupervised on the property. With respect to the more conventional academic aspect of the Sandpiper curriculum, the instructor of a course known as "Veterinary Aspects of Horsemanship" testified that said course was offered on only one occasion as a private lesson to a single student. Of the other courses offered, only three persons have signed up to receive instruction in Horse Training while there had never

been any enrollment in Huntseat I or II, Introduction to the Study of Horsemanship, Theory of Horsemanship and Teaching of Riding. No written tests have been administered other than on the occasion of a special program known as a "mock hunt".

As conceded by its principals, Sandpiper is not affiliated with any school district, college or university despite the fact that one student "appears to be getting" some academic credit as a result of an arrangement he had made with his educational institution. None of the instructors at Sandpiper is licensed to train others to ride or to advise others on how to train horses. Nor does Sandpiper possess any license to operate as a private school.

The Sandpiper facilities were concededly used for the boarding of horses which belonged to nonstudents. The principals offered the explanation that all horses boarded at the facility were used for instructional purposes. Presumably, however, these owners would not be prevented from riding their horses at their convenience independent of Sandpiper's instructional pursuits.

After careful consideration of the evidence adduced, we conclude that Sandpiper is more in the nature of a commercial riding establishment than a school of horsemanship. The defendants' allegation that their claim to school status is validated by the Pennsylvania case of *Burgoon v Zoning Hearing Bd.* (2 Pa Commw 238, 277 A2d 837), where the subject use was held to be educational in nature entitling it to a special exception, is unpersuasive. In *Burgoon,* the equestrian center at issue had been licensed as a private academy in tutoring equestrian arts by the State Department of Public Instruction. Moreover, it had in its curriculum a program directed toward qualifying its students to instruct in equestrian art. Accredited educational institutions, including at least one college, included instruction at the subject center as part of their physical education programs. In view of these marked distinctions from the instant case, the defendants' reliance on *Burgoon* is misplaced.

Nor does the Court of Appeals holding in *Rorie v Woodmere Academy* (52 NY2d 200) compel a result favorable to the defendants. In *Rorie,* a summer program run by a private school was found to constitute a permitted use rather than a proscribed day camp where a substantial part of the summer program was devoted to subjects which are normally part of

the regular academic curriculum. In view of both the subject matter and the unstructured nature of the Sandpiper curriculum, the instant case cannot conceivably fit within the rubric of *Rorie*.

The mere fact that certain residents and/or patrons may find the use a desirable one provides no justification for its continuance at its present location. Courts have evinced a willingness "to enforce strict compliance with the noncommercial requirement no matter the desirability of the activity or the relatively small disruption it might occasion" *(Town of Huntington v Park Shore Country Day Camp of Dix Hills,* 47 NY2d 61, 68, *rearg denied* 47 NY2d 1012; *see also, McNalley v Zoning Bd. of Review,* 102 RI 417, 230 A2d 880, 882).

The defendants' contention that the village should be estopped from enforcing its zoning ordinance is likewise without merit. Rather than providing Sandpiper with assurances as to the propriety of its use, the minutes of the Board of Trustees' meetings reveal the existence of a substantial question in the minds of the board members as to whether the intended use was a legally permissible one. Although the Village Attorney at one point expressed an opinion, based largely on out-of-State law, that Sandpiper was a permitted operation, this was not a pronouncement made in the course of a hearing to determine that precise issue *(cf. Village Green Condominium Corp. v Nardecchia,* 85 AD2d 692, 693). Under the circumstances, the opinion did not rise to the level of an official action or assurance.

Although two building permits were issued by former Superintendent of Buildings Giannoni, one of which was issued after the effective date of his resignation, they are invalid to the extent that they are in derogation of Village of Asharoken Zoning Ordinance § 301 which proscribes the erection or alteration of any building which is intended or designated to be used for a purpose other than that permitted by that section. In essence, a permit issued for an invalid use is necessarily invalid. On these facts, the principals of Sandpiper had no vested right to construct an indoor riding ring prior to the village's revocation of the improperly issued permit. As explained by Justice Lazer in *Reichenbach v Windward at Southampton* (80 Misc 2d 1031, 1034, *affd* 48 AD2d 909, *lv dismissed* 38 NY2d 912): "A vested right to complete a nonconforming building matures when substantial work is performed and obligations are assumed in good faith reliance on a permit legally issued * * * Basic to traditional vested rights

jurisprudence is the tenet that there is no right to reliance upon an invalid building permit".

With respect to the defendants' application to compel the village to issue a certificate of occupancy, we note that the granting of a building permit, followed by the completion of work on the structure, does not per se give rise to an estoppel against denial of a certificate of occupancy *(Village Green Condominium Corp. v Nardecchia,* 85 AD2d 692, 693, *supra).* "No building permit by an administrative official could condone, or afford immunity for, a violation of law" *(Marcus v Village of Mamaroneck,* 283 NY 325, 330). Building Administrative Ordinance for the Village of Asharoken § 8 provides that the Superintendent of Buildings shall issue a certificate of occupancy only where he determines that the work has been completed in accordance with the village ordinance. There can be no such determination in the instant case inasmuch as the construction of an indoor riding ring on the subject property is in patent derogation of the Village of Asharoken Zoning Ordinance § 301. Moreover, although the trial testimony disclosed the existence of a significant factual dispute concerning the extent to which work on the subject building had been completed prior to plaintiff's revocation of the building permit, we concur with the trial court's findings that a substantial portion of the work was done subsequent to the revocation. Thus, notwithstanding the expenditures incurred by Sandpiper, we find no error in the directive that the defendants remove from the subject premises the building housing their indoor riding ring. Said directive is but a natural corollary of our conclusion that Sandpiper's operations do not constitute a permitted use under the village zoning ordinance.

LAZER, J. P., BRACKEN and KUNZEMAN, JJ., concur.

Ordered that the judgment of the Supreme Court, Suffolk County, entered June 28, 1984, is affirmed, without costs or disbursements.