[862 NYS2d 358]

In the Matter of GRA V, LLC, et al., Appellants, v Meenakshi Srinivasan et al., Respondents.

First Department, July 29, 2008

## APPEARANCES OF COUNSEL

*Sheldon Lobel, P.C.*, New York City (*Richard Lobel* and *Jordan Most* of counsel), for appellants.

*Michael A. Cardozo, Corporation Counsel*, New York City (*Victoria Scalzo, Stephen J. McGrath* and *Virginia Waters* of counsel), for respondents.

## OPINION OF THE COURT

BUCKLEY, J.

Petitioner GRA V, LLC (Owner) acquired two adjoining lots with the intention of developing a seven-story, 63-unit apartment building in an area that consisted mostly of detached one- and two-family homes, but was zoned R6, which allows medium density housing, i.e., buildings up to 12 stories. Residents of the area opposed the project, claiming that it would "destroy the character of the . . . neighborhood," and a race ensued: the community sought to obtain a rezoning to prohibit structures of Owner's planned magnitude, while Owner endeavored to complete as much of the construction as possible before any such rezoning.

Administrative Code of the City of New York § 27-157 (a) (1) and § 27-164 require applications for new building and foundation permits to be accompanied by a "lot diagram . . . drawn in accordance with an accurate boundary survey, made by a licensed surveyor." Instead of a lot diagram by a licensed surveyor, Owner submitted a "Sanborn map," published by the Sanborn Library LLC, which advises that "the information contained in this product is believed by the publishers to be reliable, but its accuracy is not guaranteed." Owner's architect affixed her stamp and signature to the Sanborn map, thereby attesting "to the best of [her] knowledge and belief, the plans

and work shown thereon comply with the provisions of the building code and other applicable laws and regulations."

The Sanborn map inaccurately depicted the structure on an adjacent lot as flush with the street line, when in fact it was set back one foot and nine inches. Owner's plans, based on that inaccuracy, would result in a building that violated the pertinent zoning regulations, which required a new construction in an R6 area on a street less than 75 feet wide to be located no closer to the street line than the adjacent existing buildings.

On September 7, 2004, the Department of Buildings (DOB) issued Owner a foundation and excavation permit. By September 28, Owner completed the excavation and poured about 85% of the foundation, spending approximately $450,000 on the project. On that same date, the City Council approved a law rezoning the area from R6 to R4A, allowing only one- and two-family residences, and thus prohibiting a building the size of Owner's planned construction. The next day, DOB issued a stop work order on the basis that the permit had been automatically revoked by the rezoning.

Owner filed a request to vacate the stop work order on the ground, inter alia, that it had acquired a common-law vested right to continue development of the project.* Initially, DOB did not contest Owner's invocation of the common-law vested rights doctrine because, even though it was against DOB policy to accept Sanborn maps, Owner's architect had "stamped the map with her seal and assured the reviewing plan examiner that the map accurately represented the conditions at the site." It was only after the community submitted a survey demonstrating the inaccuracies of the Sanborn map, which revealed noncompliance with zoning regulations, that DOB opposed Owner's common-law vested rights argument. Even then, DOB declined to reject the request to vacate the stop work order until Owner submitted its own survey. It was only after Owner submitted its survey, confirming that the original plans did not conform to zoning resolutions, that DOB denied the request. Thereafter, Owner applied to respondent Board of Standards and Appeals of the City of New York (BSA) for a determination that it had acquired a common-law vested right to continue development of the project. BSA denied the application on the ground that the foundation permit upon which Owner relied was invalid,

---

* Petitioners now concede that they do not qualify for statutory vested rights under New York City Zoning Resolution § 11-331.

because Owner's plans were not accompanied by "an accurate boundary survey, made by a licensed surveyor," as required by Administrative Code § 27-157 (a) (1) and § 27-164.

It is well settled that vested rights cannot be acquired in reliance upon an invalid permit (*see Matter of Natchev v Klein*, 41 NY2d 833, 834 [1977]; *Matter of Jayne Estates v Raynor*, 22 NY2d 417, 422 [1968]). Even where DOB erroneously issues a permit due to its own initial failure to notice that a builder's plans do not comply with code provisions, no vested rights are acquired, since the permit could not have been validly granted in the first place (*see Matter of Perrotta v City of New York*, 107 AD2d 320, 324-325 [1985], *affd* 66 NY2d 859 [1985]). Furthermore: "A determination as to whether [a] petitioner had vested rights under [its] building permit must, of necessity, involve an examination of the validity of the permit, as well as compliance with technical provisions of the Zoning Resolution, and this is clearly an appropriate inquiry for agency expertise" (*id.* at 324). The determinations of BSA, as the ultimate administrative authority charged with enforcing the Zoning Resolution, are thus entitled to great deference (*see Matter of Toys "R" Us v Silva*, 89 NY2d 411, 418-419 [1996]). Here, BSA's determination that the permit was invalid because Owner's application was supported only by an inaccurate Sanborn map, rather than an accurate actual survey, and that the proposed construction would run afoul of zoning resolutions pertaining to siting distances, was rational, and therefore should not be disturbed.

In contravention of *Matter of Perrotta v City of New York* (107 AD2d 320 [1985], *affd* 66 NY2d 859 [1985]), the dissent takes the position that the determination of the validity of a permit and compliance with technical provisions is a pure legal issue for the courts and on which agency expertise is entitled to no deference. Moreover, the dissent argues that the foundation permit must be examined without regard to the rest of the proposed building, while simultaneously maintaining that the foundation permit is inseparable from the entire planned building. Specifically, the opposing writing argues that, for the purpose of assessing whether a foundation permit was validly issued, it is immaterial whether or not the above-ground structure would violate any zoning resolutions; but for the purpose of determining vested rights, the proposed above-ground structure must be deemed an integral part of the foundation permit, and thus a vested right in a foundation permit would automatically confer a vested right in the entire building.

Respondents take the consistent position that a foundation permit should be examined as part of an entire construction, for both validity and vesting purposes, and *Matter of Glenel Realty Corp. v Worthington* (4 AD2d 702, 703 [1957], *lv dismissed in part and denied in part* 3 NY2d 708, 924 [1957]), quoted by the dissent, speaks of the foundation as "an integral part of the whole structure."

The dissent would also set a new standard for determining when the common-law vested rights doctrine applies: that a permit need not have been validly issued, but merely somewhat validly. DOB and BSA take the position that a permit "is either valid or invalid" and that a "permit does not become valid because it is slightly invalid." In another context, one might say that there is no such thing as being slightly pregnant. In fact, the court in *Perrotta* rejected the dissent's argument, ruling that it was not for the courts to declare that a permit was " '*technically* unlawfully issued' " or that " 'compliance with mere technical matters [should] be viewed as curable irregularities, not as grounds for revocation [of a permit]' " (107 AD2d at 323, quoting 122 Misc 2d 683, 687, 688 [1984] [the decision under review]). The principles of equitable estoppel underlying the vested rights doctrine apply only when there is a validly issued permit (*see Natchev*, 41 NY2d at 834; *Jayne Estates*, 22 NY2d at 422); the dissent would shift the analysis and apply equitable estoppel to the threshold issue of determining whether the permit was validly issued. However:

> "a municipality, it is settled, is not estopped from enforcing its zoning laws either by the issuance of a building permit or by laches and the prior issue . . . of a building permit could not confer rights in contravention of the zoning laws . . . [;] estoppel is not available to preclude a municipality from enforcing the provisions of its zoning laws and the mistaken or erroneous issuance of a permit does not estop a municipality from correcting errors, even where there are harsh results" (*Matter of Parkview Assoc. v City of New York*, 71 NY2d 274, 282 [1988] [internal quotations marks, brackets and citations omitted], *cert denied* 488 US 801 [1988]).

To the extent the dissent contends that DOB and BSA acted in an arbitrary and capricious manner in denying Owner's application, the record establishes that DOB at first was willing to consider the request, based on Owner's architect's stamping the

Sanborn map as accurate, and only denied the application after reviewing Owner's own formal survey, which revealed the noncompliance with zoning regulations. Thus, DOB and BSA made their determinations based upon a careful evaluation of all the facts, with a full and fair opportunity for Owner to make any pertinent submissions.

Finally, the dissent's concern with unpredictable governmental action is unfounded in this case, where Owner knew that a change in the zoning law was possible, if not probable, and with that forewarning took a gamble to construct the foundation before that. Moreover, that gamble was staked on the risky use of a Sanborn map that was certified as accurate even though no survey had been undertaken. Indeed, the record supports an inference that Owner submitted a Sanborn map, rather than taking the time to conduct an actual survey, in order to gain speed on the competing community group. In the words of DOB:

> "As a matter of clarification, the submission of the Sanborn map instead of a survey is not the determinative issue here. Instead, the fact that the architect filed for an erroneous street wall setback is determinative. An architect should have realized that it was reckless to rely on a [Sanborn] map as accurately depicting the location of the adjoining properties to satisfy the requirements of [Zoning Resolution] § 23-633. . . .

> "The architect should have known that only a survey would accurately depict the existing conditions at the site. Therefore, any hardship is self-created."

Absent from the dissent's discussion of equitable principles is mention of the fact that Owner created the very conditions leading to revocation of the permit by attesting to a Sanborn map as accurate without verifying whether that assertion was true.

Accordingly, the order of the Supreme Court, Bronx County (Alexander W. Hunter, Jr., J.), entered October 6, 2006, which denied the petition brought pursuant to CPLR article 78 to annul the determination of respondent Board of Standards and Appeals of the City of New York denying the application for a declaration that petitioner GRA V, LLC had acquired a common-law vested right to continue development under zoning regulations applicable prior to the enactment of more restrictive zoning, should be affirmed, without costs.

McGUIRE, J. (dissenting). On August 9, 2005, respondent Board of Standards and Appeals of the City of New York (BSA) issued a resolution determining that petitioners had not acquired a common-law vested right to continue development of a seven-story, 63-unit apartment building prior to September 28, 2004, the date the City Council changed the zoning law for the area in which the building was to be located. The revised zoning law authorizes only the construction of one- or two-family detached houses and thereby prohibits the construction of apartment buildings like the one petitioners proposed to build. That determination by BSA was predicated, in turn, on its determination of a question of law, i.e., whether, under the common-law vested rights doctrine, the foundation permit issued to petitioners on September 7, 2004 by the New York City Department of Buildings (DOB) was "validly issued."

In my view, BSA erred in deciding this question of law adversely to petitioners. Although the construction of the foundation in accordance with the permit did not itself violate any law, BSA nonetheless concluded that the foundation permit was not validly issued. It so concluded in part because of an error in its issuance that has no necessary consequences for the ability of petitioners to construct a building that would comply in full with all zoning requirements in effect prior to the change in the zoning law. Critically, BSA never purported to find either that an above-grade structure complying in full with all such requirements could not be erected from the foundation or that the actual placement of the foundation violated any law. Indeed, petitioners' position on both of these points was not disputed before BSA.

The common-law vested rights doctrine "has generally been described as an application of the constitutionally based common-law rule protecting nonconforming uses," but "is also said to have been grounded on principles of equitable estoppel" (*Matter of Ellington Constr. Corp. v Zoning Bd. of Appeals of Inc. Vil. of New Hempstead*, 77 NY2d 114, 122 [1990]). Under this doctrine,

> "[i]t well settled that one who, in reliance upon a permit validly issued by a municipality, in good faith makes substantial improvements and incurs substantial expense in order to make his land suitable for a specific purpose or use, acquires a vested right to such use, even though, by reason of subsequent changes in the zoning ordinance such use has

become a prohibited or nonconforming use" (*Matter of Glenel Realty Corp. v Worthington*, 4 AD2d 702, 703 [1957], *lv dismissed in part and denied in part* 3 NY2d 708, 924 [1957]; *see also Incorporated Vil. of Asharoken v Pitassy*, 119 AD2d 404, 416 [1986], *lv denied* 69 NY2d 606 [1987] ["A vested right to complete a nonconforming building matures when substantial work is performed and obligations are assumed in good faith reliance on a permit legally issued"]).

After the foundation permit was issued, petitioners began constructing the foundation. However, on September 29, 2004, the day after the City Council acted to change the zoning law, a DOB inspection showed that the foundation had not been completed. For that reason,[1] and in light of the rezoning, DOB issued a stop work order, dated September 29, 2004, prohibiting all work at the premises as of October 5, 2004. According to petitioners, prior to the cessation of work, the construction of the foundation and retaining walls was approximately 85% complete. As of September 28, 2004, petitioners had paid the general contractor some $203,000 of the estimated $275,000 cost of the foundation; an additional payment of $32,000 was due and owing to the foundation contractor. In addition, petitioners had spent approximately $65,000 for site clearing, asbestos removal and demolition work. All told, petitioners asserted that as of September 28, 2004, they had spent or committed to spend approximately $340,000.

BSA appears not to have reached the issue of whether the foundation had been substantially completed with substantial expenditures made by petitioners prior to the zoning change. Rather, BSA concluded that "notwithstanding the degree of excavation and foundation work performed," petitioners had "no vested right to continue construction at the site" because the foundation permit was "invalidly issued."

So far as can be gleaned from the resolution, BSA concluded that the foundation permit was not validly issued for two interrelated reasons. First, although Administrative Code of the City of New York § 27-157 (a) (1) requires that applications for new building permits be accompanied by a "lot diagram . . . drawn

1. Under a provision of the zoning law not relevant to this appeal, a property owner has a statutory right to continue construction if the foundation has been completed and the building permit had been validly issued before the effective date of the zoning change.

in accordance with an accurate boundary survey, made by a licensed surveyor," petitioners' application for the foundation permit was accompanied only by a "Sanborn map," which is not a map "made by a licensed surveyor." As is undisputed, however, and as the resolution expressly states, "when the plan examiner reviewed and approved the Foundation Permit on September 7, 2004, he accepted a Sanborn map in lieu of the required initial site survey." Second, the Sanborn map erroneously indicated that the building on an adjacent parcel, a garage, was built on or flush with the lot line. In fact, as was made clear by a survey undertaken at DOB's request after work on the foundation had ceased pursuant to the stop work order, the garage was set back 1.75 feet from the lot line. Under the setback requirements of the applicable zoning resolution, the street wall of the building petitioners proposed to build could not be located "closer to the street line than the street wall of an adjacent existing building." However, if constructed in accordance with the building plans submitted by petitioners' architect at or about the time petitioners applied for the foundation permit, the street wall of the building petitioners proposed to build would be closer than 1.75 feet from the street line.

It is unclear whether BSA regarded the submission of a Sanborn map, rather than the lot diagram by a licensed surveyor required by Administrative Code § 27-157 (a) (1), as alone sufficient to render the foundation permit invalidly issued. BSA, however, did not expressly state that this error was sufficient to render the foundation permit invalidly issued. Nor did it appear to regard the plan examiner's "accept[ance of] a Sanborn map in lieu of the required initial site survey" as having any relevance to the question of the validity of the permit's issuance.

In any event, the mere submission and acceptance of a Sanborn map cannot sensibly be thought to render a foundation permit invalidly issued. After all, a Sanborn map is not necessarily inaccurate with respect to the extent of the setback of an adjacent building. If a property owner incurred substantial expenditures in substantially completing a foundation permit issued after a municipal official's acceptance of a Sanborn map that proved to be accurate, the municipality could not contend that the permit was invalidly issued. To accept that contention would be inconsistent with the "principles of equitable estoppel" (*Ellington*, 77 NY2d at 122) that support the vested rights doctrine. As the United States Supreme Court put it in discuss-

ing the equitable doctrine of estoppel, "[t]o say to these appellants, 'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great government" (*Heckler v Community Health Services of Crawford Cty., Inc.*, 467 US 51, 61 n 13 [1984] [internal quotation marks and citation omitted]). In my view, the requirement that a permit be "validly issued" does not mean that the permit must be impeccably issued.[2]

BSA's determination that the foundation permit was not validly issued appears to have been based on a different, albeit related, conclusion. Petitioners stressed before BSA that no above-grade structure had been constructed and that the construction and actual placement of the foundation below grade did not violate any law. As noted above, BSA did not purport to find to the contrary. Nor did BSA reject petitioners' contentions that (1) the foundation permit authorized the construction of the foundation only, not any portion of the superstructure above the foundation, and (2) with minor revisions to the planned superstructure, a building complying in full with all setback requirements could be constructed without any changes to the as-built conditions of the foundation.[3] By contrast, as BSA's resolution recites, DOB maintained that "the fact that no structure above-grade has been constructed does not have any relevance to the validity of the permit when issued." The basis for this contention was DOB's position, also recited in the resolution, "that the overall building design cannot be separated from the foundation design, and thus the overall structure must comply with zoning for the Foundation Permit to be valid upon issuance." After setting forth DOB's position, the resolution states that "[BSA] agrees with DOB's position as set forth above."

This unbreakable welding of the foundation permit with the design of the building as contemplated at the time of the

---

2. A property owner could plan to erect the street wall of a proposed building farther back from the street line than required by law due to a Sanborn map that inaccurately indicated that the street wall of the adjacent building is set back farther than it actually is. It would be absurd as well as inequitable to conclude that a permit that otherwise would result in greater compliance with setback requirements would be invalidly issued if the municipal official accepted such a Sanborn map rather than the required diagram prepared by a licensed surveyor.

3. Nor, for that matter, do respondents (BSA and its commissioners in their official capacity) take issue with any of these contentions in the brief they submitted to this Court. Rather, respondents' position is that these contentions are irrelevant to the issue of whether the foundation permit was validly issued.

permit's issuance is flawed for several reasons. In the first place, it is unsupported by any precedent. To the contrary, it is inconsistent with *Glenel Realty* (4 AD2d 702 [1957]). There, the property owners, in reliance on excavation and foundation permits, had "virtually completed" the foundations for the commercial buildings they planned to erect and had incurred substantial expense in doing so prior to an amendment to a zoning ordinance that prohibited the commercial buildings (*id.* at 703). The municipal respondent argued that the owners' "vested right, if any, must be confined to the foundation only, and does not extend to the completion of the superstructure or its use" (*id.*). Although the Court went on to observe that "by express language, all of [the permits] relate to permission to erect the entire structure" (*id.*), it first rejected the municipality's argument that the vested right "must be confined to the foundation only." As the Court stated:

> "Such an argument is not only shocking to the sense of justice but also leads to a *reductio ad absurdum*. The foundation is an integral part of the whole structure; it *is the foundation*. Where, as here, the superstructure is a one- or two-story 'taxpayer' and part of the basement is to be utilized for rental purposes, the foundation may be said to be a major part of the whole structure. Consequently, the vested right in the foundation must connote a vested right to the erection and subsequent use of the specific superstructure for which the foundation was designed. *It is the construction of the foundation and the substantial cost thereof which establish and define the builder's vested rights in relation to the superstructure and its use, and which entitle him to complete it in accordance with the zoning ordinance in force at the time of the construction of the foundation*" (*id.* [final emphasis added]).

In essence, DOB's position, embraced by BSA, trivializes the valuable property rights protected by the vested rights doctrine, a doctrine that advances "the constitutionally based common-law rule protecting nonconforming uses" (*Ellington*, 77 NY2d at 122).[4] Under BSA's view of the requirement that a permit be validly issued, when a property owner constructs a foundation

---

4. Thus, like the limitations imposed by the Fifth Amendment on the government's eminent domain power, the common-law vested rights doctrine "serve[s] to protect 'the security of Property,' which Alexander Hamilton

in good faith reliance on a foundation permit issued by a municipality and thereby incurs substantial expense (hundreds of thousands of dollars, for example), the owner is entitled to none of the protections of the doctrine whenever plans for the superstructure submitted before or with the application for the foundation permit indicate that the superstructure would be noncompliant in any respect. This is so, under BSA's view, even when the foundation itself violates no legal requirements and even if the noncompliance, however minor, could readily be cured and a superstructure could be erected in full compliance with the zoning requirements in effect at the time of the foundation permit's issuance.[5]

That BSA's interpretation of the requirement that a permit be validly issued is indefensible is brought into focus by a concession BSA made at oral argument. Counsel for BSA was asked whether BSA's position would be the same if the relevant facts otherwise were the same but the plans for the superstructure above the legally unobjectionable foundation would result in the street wall being located one inch closer to the street line than permitted, and even if this minor error in the plans for the superstructure could readily be corrected. The answer that counsel gave, "yes," is absurd,[6] but it is entailed by BSA's position that a foundation permit is invalidly issued whenever the plans for the superstructure indicate any deviation from the required setback, however minor or easily corrected. In my view, given the common-law origins of the vested rights doctrine, it is

described to the Philadelphia Convention as one of the 'great obj[ects] of Gov[ernment]' " (*Kelo v New London*, 545 US 469, 496 [2005, O'Connor, J., dissenting], quoting 1 Records of the Federal Convention of 1787, at 302 [M. Farrand ed 1911]). I do not of course suggest that BSA's determination was tantamount to an unconstitutional taking of petitioners' property without just compensation. I do maintain, however, that the vested rights doctrine also helps "ensure stable property ownership by providing safeguards against excessive, unpredictable, or unfair use of the government's . . . power" (*id.*).

5. Under this view, furthermore, the submission of the Sanborn map rather than the required surveyor's diagram is irrelevant. After all, if the same mistake made in the Sanborn map had been made by a licensed surveyor, the foundation permit still would be invalidly issued.

6. Consider, moreover, two property owners who are issued foundation permits and incur hundreds of thousands of dollars of costs in the course of constructing the foundations in good faith reliance on the permits. If the plans for the superstructure of one but not both of the buildings contain a slight but easily corrected error by the architect that if not corrected would result in a de minimis violation of setback requirements, one of the property owners would enjoy all, and the other property owner would enjoy none, of the protections of the vested rights doctrine.

particularly appropriate that the validly-issued requirement be construed in accordance with, not in disregard of, the common-law maxim de minimis non curat lex, i.e., the law does not concern itself with trifles (*see e.g. Matter of Dworman v New York State Div. of Hous. & Community Renewal*, 94 NY2d 359, 375 [1999]; *Van Clief v Van Vechten*, 130 NY 571, 579 [1892]).

Before discussing the majority's writing, three other points should be made. First, none of the cases cited by BSA support its view of the validly-issued requirement. With one possible exception, in the cases BSA cites in which permits were held to be invalidly issued, no building could be constructed consistent with the requirements of law in effect at the time of the permit's issuance (*see e.g. Matter of Perrotta v City of New York*, 107 AD2d 320, 325 [1985], *affd* 66 NY2d 859 [1985]; *Matter of Albert v Board of Stds. & Appeals of City of N.Y.*, 89 AD2d 960, 962 [1982], *appeal dismissed* 59 NY2d 673 [1983]; *Village of Asharoken,* 119 AD2d at 416). In the one possible exception, *Matter of Natchev v Klein* (41 NY2d 833 [1977]), it is not clear whether a compliant building could be erected. In any event, the permit at issue was a building permit and not a foundation permit, and there is no indication in the Court of Appeals' opinion or in the Appellate Division's opinion (51 AD2d 573 [1976]) that the property owner was seeking approval for a modification that would result in a building complying with all applicable legal requirements.

Second, BSA is not persuasive in arguing that separating the issuance of a foundation permit from the proposed building design "would encourage developers cognizant of a zoning change to file haphazard applications for foundation permits with the idea that they could simply 'fix' the building design after the effective date of the zoning change." One complete answer to this argument is that DOB need not approve "haphazard applications for foundation permits" or applications that are accompanied by a Sanborn map rather than a diagram prepared by a licensed surveyor. Another complete answer is that this argument would deprive not only the haphazard property owner of the protections of the vested rights doctrine but also the circumspect owner who nonetheless makes a minor mistake. A third complete answer is that this argument ignores that haphazard applicants, like all other applicants, are entitled to the protections of the vested rights doctrine only if they show that they relied in good faith on the permit issued by the municipality.

Third, BSA made no finding on the question of good faith reliance by petitioners on the foundation permit. Notably, moreover, in their brief to this Court, respondents do not even dispute the issue of good faith reliance by petitioners on the foundation permit. Indeed, respondents implicitly concede the point to petitioners. After all, respondents contend that if this Court were to determine that the foundation permit was validly issued, a remand to BSA would be required to decide not the issue of good faith reliance but *only* the issue of whether substantial construction had occurred and substantial expenditures were incurred prior to the change in the zoning law.

The majority errs in attributing to me the position that "compliance with technical provisions is a pure legal issue for the courts and on which agency expertise is entitled to no deference." I do not of course subscribe to that position. BSA's determination in this case that the foundation permit was not validly issued does not rest on any factual or technical determination made by BSA with which I disagree or to which I do not defer. Rather, BSA's determination rests on the conclusion of law, contrary to *Glenel Realty Corp.* (*supra*), that the validity of the foundation permit's issuance is inseparably fused with the plans for the superstructure that had been submitted at or about the time of the application for the foundation permit.

As is evident, I certainly do not "maintain[ ] that the foundation permit is inseparable from the entire planned building." Nor do I argue that "for the purpose of assessing whether a foundation permit was validly issued, *it is immaterial* whether or not the above-ground structure would violate any zoning resolutions" (emphasis added). Rather, my position, squarely supported by *Glenel Realty*, is that BSA errs in maintaining that the foundation permit is inseparable from the planned building. If BSA had determined that no above-ground structure could be built from the foundation without violating a provision of the governing zoning law, I would not pause before deferring to that finding (as long as it was not irrational or without any factual support) and concluding that the foundation permit was not validly issued. Under BSA's view of the requirement that the permit be validly issued, any change in the plans for the above-ground structure—such as the hypothetical one-inch modification noted above—however trivial and readily correctible, renders a previously issued foundation permit invalidly issued, even though the foundation authorized by the permit does not violate any applicable legal requirements, the property

owner acted in good faith, and the foundation is substantially completed with substantial expenditures incurred by the property owner.

The majority paints an unflattering picture of petitioners, stating that they "gamble[d] . . . on the risky use of a Sanborn map" in order to "gain speed on the competing community group," and even referring to DOB's contention—never accepted by BSA—that an "architect should have realized that it was reckless to rely on a [Sanborn] map." But this unflattering portrait of property owners who ostensibly got what they deserved is inappropriate for two reasons: first, BSA made no findings adverse to petitioners on these matters and respondents implicitly concede petitioners' good faith; and second, the undisputed fact is that the error in the Sanborn map did not result in the construction of a foundation that violates any legal requirements, and the error is irrelevant to the ability of petitioners to construct a building complying in full with all the requirements of law in effect prior to the change in the zoning law.[7]

Finally, *Matter of Parkview Assoc. v City of New York* (71 NY2d 274 [1988], *cert denied* 488 US 801 [1988]), relied upon by the majority, supports my position rather than the majority's. The permit at issue in that case was a building permit and the Court held that the permit "was invalid inasmuch as it authorized construction . . . in violation of New York City Zoning Resolution § 96-06" (*id.* at 281). Here, by contrast, the permit is a foundation permit and it did not authorize construction of a foundation that violated any law.

In sum, my view is that BSA's conclusion of law that the foundation permit was not validly issued is contrary to law and irrational. As my view does not command a majority, it would

---

7. The majority errs to the extent it suggests that once "a race ensued," to use the majority's apt phrase, petitioners acted improperly in seeking to get to the finish line before the competing community groups. Just as the community groups had every right to seek a change in the zoning laws as expeditiously as possible, petitioners had every right to develop their property as expeditiously as possible. Moreover, absent from the majority's discussion of equitable principles is mention of the fact that DOB's plan examiners approved the foundation despite what must have been an obvious flaw in the application. Furthermore, one can only wonder what the majority's view would be in a case in which a property owner's architect made an innocent error in good faith on a technical issue that similarly was irrelevant both to the legality of the foundation actually constructed in reliance on the permit and the ability of the owner to erect a superstructure complying in full with all then-applicable legal requirements.

be pointless for me to grapple with the issue of whether the remaining issue—whether petitioners substantially completed the foundation while incurring substantial expenditures—can or should be decided by this Court rather than by BSA upon remand (*see Matter of Pantelidis v New York City Bd. of Stds. & Appeals,* 10 NY3d 846 [2008]).

FRIEDMAN and MOSKOWITZ, JJ., concur with BUCKLEY, J.; ANDRIAS, J.P., and MCGUIRE, J., dissent in a separate opinion by MCGUIRE, J.

Order, Supreme Court, Bronx County, entered October 6, 2006, affirmed, without costs.